MERCHANTS NATIONAL BANK AND
TRUST COMPANY OF FARGO, Trustee
of John M. Schroeder, Inc., a Bankrupt,
Plaintiff and Respondent,

v.

CITY OF GRAND FORKS, a Municipal Cor-
poration, Defendant and Appellant.

No. 8045.

Supreme Court of North Dakota.

Sept. 11, 1964.

Gordon Caldis, Grand Forks, for defendant and appellant.

Stokes, Vaaler, Gillig & Warcup, Grand Forks, for plaintiff and respondent.

BURKE, Judge.

The City of Grand Forks has appealed from a judgment entered against it in an action upon implied contract for materials and labor furnished in the repair of a damaged installation in the city water plant. The City has demanded a trial de novo in this court.

In June 1956, the City of Grand Forks entered into a contract with Eickhof Construction Company for the construction of improvements to the municipal waterworks of the city. Eickhof Construction sublet the electrical installation to John M. Schroeder Inc. Part of this work included the placement of switchgear, by means of which high voltage electric current was received from the power plant and delivered to the several water plant uses at proper voltages. The work was completed in March or April 1958. Upon completion, the City took possession of the installation and used it to operate motorized equipment within the plant. The switchgear contained several circuit breakers, one of which was used to operate the No. 1 high service pump and another of which was used to operate the No. 2 high service pump. These circuit breakers rested on rails and they could be pulled out from the switchgear cabinet in the same manner that a filing drawer can be pulled out of a filing cabinet. Upon each circuit breaker was a latch mechanism which held the circuit breaker in place when it had been placed in operating position within the cabinet. Between the time the City took over the operation of the switchgear in March or April 1958, and July 1959, difficulties developed upon several occasions in the latching mechanism upon one of the circuit breakers. On these occasions repairs were made by an employee of the installing contractor.

On the morning of July 1, 1959, Mr. Hoban, the city engineer, received a telephone call from the chief operator of the water plant, who told him that there was trouble with the No. 1 circuit breaker. After the call Mr. Hoban, went to the plant,

and according to his testimony he and the chief operator "removed the starter and seen that the contacts were gone and there was nothing that we could do with it so we just closed the door and left it." Mr. Hoban also testified that the contacts were burnt and some of them were broken.

Immediately after the circuit breaker had been replaced in its operating position it caught fire, and as a result it was damaged beyond repair. The connecting wires to the outside power source were also destroyed. After the fire had been put out, Mr. Hoban instructed the chief operator, Ostlie, to call the installing contractor, John Schroeder, to come and make repairs.

When Mr. Schroeder arrived at the plant, he spoke first to Mr. Jenson, the plant superintendent. Mr. Webster, the city manager, came in shortly thereafter and the three of them "talked about the damage, the extent of it, how long it would take to put the gear back in operation, how much water was on hand, how soon we would be getting into an emergency situation, if the gear wasn't at least partially placed in service." The water plant superintendent and the city manager told him, "that if we could have the gear back in service by 6:00 o'clock that evening, at least on a partial operation basis, we could avoid an emergency situation." They told him "to get it fixed."

As a protective equipment for the circuit breaker, there were placed within it arc chutes or arc quenchers. These were plates made of asbestos cement, the function of which was to shield inflammable parts within the breaker from any arcing that might take place upon the opening or closing of the breaker. These arc quenchers were not in the equipment at the time of the fire. When Mr. Schroeder arrived upon the scene they were lying on the floor beside the switchgear cabinet.

As a result of the fire, circuit breaker No. 1 was completely destroyed and it was considered that some damage had been done to the circuit breaker No. 2. The City has a spare circuit breaker on hand. This was installed in the compartment of the No. 1 circuit breaker. An engineer of the manufacturing company was flown to Grand Forks to inspect the installation before it was placed in service. The work was completed by the six o'clock p. m. deadline fixed by the city officials. Circuit breaker No. 2 was removed and sent to the manufacturer for inspection, adjustment and repair and a new circuit breaker was ordered to be shipped by air express to replace the one which had been destroyed. Upon receipt of the new circuit breaker and the repaired circuit breaker, the John M. Schroeder Company installed them in the switchgear cabinet. Thereafter, it presented its bill for materials and services and the bill was rejected by the City. The testimony that the reasonable value of the materials and services was $3,263.68 is undisputed.

The City disclaims liability upon the ground that it had not, at the time of the fire, accepted the improvements to the water plant from the building contractor, Eickhof Construction, and that therefore the liability was that of the contractor. The City also urges that because certain procedural prerequisites were not followed in authorizing the work, that the City has no power to pay the bill.

The record shows that the switchgear and pump installation was completed in March or April 1958, and that the City took over the operation of this equipment at that time. The fire occurred July 1, 1959, some fifteen months later. Final acceptance of all of the improvement to the city water plant took place in the fall of 1959.

Paragraph FC-22 of the City's contract with the prime contractor provides:

"The Purchaser shall have the right to take possession of and use any completed or partially completed portions of the work, notwithstanding the time for completing the entire work or such portions as may not have expired; but such taking possession and use shall

not be deemed an acceptance of any work not completed in accordance with the Contract Documents. If such prior use increases the cost of, or delays the work, the Contractor shall be entitled to such extra compensation or extension of time, or both, as the Engineer may determine."

As we interpret the above contract paragraph, it provides that the taking possession of, and the use of, a completed part of the work constitutes an acceptance of that part of the work subject only to the reservation of the right to claim that the work was not completed according to contract. Since the City accepted and operated the switchgear and pumps, the contractor was relieved of liability for any subsequent damage thereto, other than damage which might result from the fact that the installation had not been completed according to contract.

In its answer the City had alleged that the No. 1 and No. 2 circuit breakers were defective. It offered proof, that latching catches which held the circuit breakers in place when they were in the operating position were defective. With respect to this proof there was a conflict in the evidence. The city engineer testified that the defective latches were on the No. 1 circuit breaker in which the fire occurred while the electrician who made the repairs on the latches stated that it was the No. 2 circuit breaker which was defective. No proof was offered that the fire was caused by the defective latches. The city electrician testified that in his opinion the fire would not have occurred had the circuit breakers been properly fused. He did not state what the amperage capacity of the fuses used, was, or what it should have been. The installing contractor testified that the fuses were as specified in the plans and that the work was inspected and approved by the city's engineers who prepared the plans. He also testified that in his opinion that the fire was caused by the fact that the city employees placed the circuit breaker in oper-

ating position without the arc quenchers in place. It is our view that the absence of arc quenchers was the probable cause of the fire but that in any event the City has offered no substantial evidence to prove that the fire and resulting damage were caused by the fact that the installation was not according to contract. It was therefore the City's obligation to repair the fire damage. If there were any question concerning the City's liability it is eliminated by another provision of its agreement with the contractor. Section FC-6 of this contract provides: "The purchaser (that is the city) shall take out all insurance to cover operating hazards, and it will be placed in force prior to preliminary tests on all items of equipment and piping subject to such hazard." Thus the City assumed the liability for all damage that might result from operating hazards and agreed to protect itself by insurance from such losses.

The argument made in the city's brief that the payment of its liability on account of the fire damage cannot be made, because the making of such payment would be ultra vires, is based wholly upon the theory that the payment would have to be made out of the general fund of the city, and that all of the contract and budget limitations upon the expenditure of monies raised by taxation apply. This is not the case. If the City complied with the terms of its building contract, as it presumably did, it had insurance to cover the loss. If it had no insurance it could make the payments out of the municipal utilities fund. Section 40–33–11 NDCC provides:

"Upon proper orders or warrants issued upon the authority of the governing body of a municipality, there shall be paid out of the municipal utilities fund all sums necessary for the operation, maintenance, enlargement, repair, alteration, improvement, and extension of the plant or plants of which the earnings go into the fund, but no municipality shall pay out of nor divert from the fund any sum for any

other purpose except as provided in section 40–33–12."

Section 3 of Regulation I of Administrative Regulations of the City of Grand Forks provides:

"3 BIDS. Where the cost for any purchase or construction project is $2,000.00 or more, bids shall be solicited by notice in the official newspaper at least five days prior to the final day for receiving bids. Such bids shall be submitted sealed to the City Manager and may be accompanied by surety in the form of a certified check, cash or bid bond in such amount as the City Manager may prescribe. All such bids shall be opened by the City Manager in public and in the presence of the Council Purchasing Committee. The Purchasing Committee shall award the contract to the lowest and best bidder, subject to the approval of the contract by the Council. Each contract submitted to the Council for approval shall be accompanied by a tabulation of all bids received. The Council shall have full and complete authority to enter into and make any contract on behalf of the City and when competitive bidding is not practical or advantageous to the City the Council may dispense with same and enter into a contract for the purchase or the construction project. * * *."

■■■ Mr. Schroeder testified that he was called to the water plant at about eleven o'clock a. m.; that he talked with the plant superintendent and the city manager; that they discussed the amount of water on hand and stated that if they could have the switchgear back in operation by six o'clock p. m. that day a critical situation could be avoided. They told him to "get it fixed." Mr. Schroeder was uncertain as to whether the plant superintendent or the city manager gave the order. This uncertainty is immaterial because both were present and at least tacitly approved of what the other did. Thus the city manager and plant superintendent attempted to contract with Schroeder for the necessary repairs. The reason that the price at which the work was to be done was not included in the contract is obvious. If the work was to be completed by the deadline fixed by the city officials there was not sufficient time to make the necessary inspection and estimates and compute a contract price prior to commencing work. Certainly there was not sufficient time to prepare specifications and solicit bids by five days notice published in the official newspaper. This was therefore a case where competitive bidding was not practical. The regulation above quoted contemplates that the city council shall approve the contract after negotiations have been completed. Clearly, the city council had the power to waive competitive bidding and approve the contract for the work ordered or approved by the city manager. The contract was not ultra vires. This is a case where the rule laid down by this court in Northwestern Sheet & Iron Works v. Sioux County, 76 N.D. 451, 36 N.W.2d 605, should be applied. In that case we said:

"A public corporation may not escape liability for the reasonable value of goods obtained and retained by it through transactions coming within the general powers of the corporation and the contracting corporate board, which are procedurally defective without paying the reasonable value thereof when equity and good conscience require payment."

The principle above stated, which was an affirmation of our prior decisions in Backhaus v. Lee, 49 N.D. 821, 194 N.W. 887, and Stark County v. Dickinson, 56 N. D. 371, 217 N.W. 525, applies with special force to this case, because here, the disputed contract was made to take care of the liability of the city to repair which had previously come into being by virtue of the building contract.

The judgment of the district court is therefore affirmed.

MORRIS, C. J., and BURKE, TEIGEN and STRUTZ, JJ., concur.

ERICKSTAD, J., not being a member of this Court at the time of submission of this case, did not participate.