Theodore **BRUSEGAARD** et al., Plaintiffs and Appellants,

v.

Ralph J. **SCHROEDER** et al., Defendants and Respondents.

Civ. No. 8821.

Supreme Court of North Dakota.

Oct. 31, 1972.

See also, N.D., 199 N.W.2d 921.

Caldis & Arneson, Grand Forks, for plaintiffs and appellants.

Thomas B. Jelliff, State's Atty., and Robert A. Alphson, Sp. Asst. State's Atty., Grand Forks, for County Commissioners of Grank Forks County.

Stokes, Vaaler, Gillig, Warcup & Woutat, Grand Forks, for Eickhof Construction Co.

Degnan, McElroy, Lamb & Camrud, Grand Forks, for Air Control Heating, Inc.

Nelson, Mack & Moosbrugger, Grand Forks, for G–M Electric Co.

TEIGEN, Judge.

The plaintiffs have appealed from a judgment dismissing their complaint. By their complaint they are seeking an injunction against the defendants to restrain them from constructing a proposed county shop building for the maintenance of county highway equipment.

The old county shop building and the land upon which it stands are located in the urban renewal area of the city of Grand Forks and were acquired by that agency for urban renewal purposes. Grand Forks County was paid $25,858 for this property which was covered into the county road fund and was earmarked for the construction of a new county shop building. Because of the urgency of the development of the urban renewal area the Grand Forks county commissioners were requested to vacate the existing county shop building at an early date. The county commissioners rented temporary quarters and at the time of the trial of this proceeding had moved most of their operations to these quarters. The county commissioners selected a site for the construction of a new county shop building upon a portion of the land commonly referred to as the "fairground property". This land is located within the city of Grand Forks and is classified by city ordinance as Fire Zone No. 1, which classification requires masonry type construction. The record title of the land in question is in Grand Forks County.

The county commissioners engaged an architect who prepared plans, specifications and details for a county shop building, which were accepted by them. The commissioners published a call for bids, and bids

were received and accepted which totaled $211,929, not including architect's fees. Contracts were executed by the successful bidders. Apparently the contracts were not executed at that time by the county commissioners for the reason that this suit was instituted with the issuance of a temporary restraining order.

This suit was instituted by thirty-two taxpayers within the county of Grand Forks, for themselves and on behalf of all others similarly situated (hereinafter taxpayers), against the county commissioners, individually and as a board (hereinafter commissioners), and against the successful bidders for the construction of the county shop building.

In their complaint the taxpayers allege: (1) that the County does not have marketable title to the land; (2) that restrictive covenants in the chain of title prohibit the proposed use of the land by the commissioners; (3) that the procedures followed by the County and its board of county commissioners in the planning, giving of notice and the acceptance of bids for the proposed construction were irregular and illegal and not in conformance with law; (4) that the decision to construct the county shop building at this location, at a cost of $211,929, not including architect's fees, is an abuse of discretion.

The commissioners, on behalf of the County, and the defendants, Eickhof Construction Company, Air Control Heating, Inc., and G–M Electric Company, who were the successful bidders and were also joined as defendants, answered the taxpayers' complaint. These answers admit paragraphs 1, 2, 3 and 4 of the complaint which allege the status of the plaintiffs, the status of the defendant commissioners, the fact of the contractors' corporate existence, the proposal and intent to construct a county shop building upon the land described in the complaint, and the acceptance of the bids received from the private corporate defendants. The remaining allegations are denied. In addition the County affirmatively alleges that the commissioners planned the con-

struction of the county shop building at the proposed location in good faith and in accordance with the statutes of the state of North Dakota. Also the private corporation defendants, in their answers, allege that they are standing ready, willing and able to perform in accordance with their contracts.

After four days of trial the district court ordered a dismissal of the proceedings. It found that the title of the County to the land in question cannot be challenged in an injunctive proceeding; that certain restrictive covenants relating to the land had terminated and that others were not violated; that no payment had been made to the architect engaged by the County and no agreement was made to pay fees in excess of the statutory limit; that an emergency situation arose because of the impairment of the old county shop building and its impending destruction by the Urban Renewal Agency which justified the commissioners in proceeding in such an emergency situation under the emergency provisions of Section 57–15–28, N.D.C.C. The trial court also found that the procedures of the County and the commissioners in planning the construction of the county shop building and giving notice of and accepting bids had been done in conformance with the provisions of the statutes and, lastly, that the commissioners had not acted in excess of their authority nor had they abused their discretion in matters concerning the building site, type of building and costs of construction. It therefore ordered a judgment of dismissal, which was entered accordingly, and this appeal was taken.

Although the taxpayers, in taking this appeal, have demanded a trial de novo they have also filed specifications of error. The record does not disclose whether the specifications of error were served upon the defendants with the notice of appeal. However, as that issue is not raised by the parties it is deemed waived. We are not empowered to review the matter de novo in view of the repeal of Section 28–27–32, N.D.

C.C., which repeal became effective prior to the time this appeal was taken. We will, however, assume that the specifications of error contained in the record were served with the notice of appeal and will review these specifications.

There are many specifications of error. In their brief and argument to this court the taxpayers have classified these specifications under four headings. We will consider them in the same order.

## ILLEGAL ACTS

The taxpayers contend that the trial court erred in not finding that the architect was illegally retained. It is their contention: (1) that the commissioners had agreed to pay a sum for his services in excess of the limitation of five per cent, as provided by Section 11–11–32, N.D.C.C.; (2) that there are no minutes of record which show that the architect was engaged, which is in violation of Section 11–11–35, N.D.C.C.; (3) that no written contract has been entered into with the architect, as required by Section 11–11–29, N.D.C.C.; and (4) that there was no appropriation contained in the budget for payment of the architect's fees, as required by Section 11–23–06, N.D.C.C.

It is the taxpayers' contention that the architect's employment is an integral part of the county shop project and that because of these illegal acts the entire project is illegal and ineffective.

Succinctly stated the statutes cited above provide:

"When a county building is to be erected * * * the board of county commissioners may engage a competent architect to prepare plans, specifications, and details. He shall not be paid more than five per cent of the total cost of the building." Section 11–11–32, N.D.C.C.

"The board of county commissioners shall keep a book in which all orders and decisions made by it shall be recorded. Such book shall be known as 'a record of the proceedings of the board of county commissioners.' * * *" Section 11–11–35, N.D.C.C.

"A contract shall be entered into under the provisions of this chapter only after it has been approved by the vote of a majority of the members of the board of county commissioners. The contract shall be made in writing * * *" Section 11–11–29, N.D.C.C.

"No county expenditure shall be made or liability incurred, nor shall a bill be paid for any purpose, in excess of the appropriation therefor * * *" Section 11–23–06, N.D.C.C. (There are certain exceptions not applicable here.)

It appears from the record made at the trial that the matter of hiring the architect was loosely handled. However, the testimony on behalf of the commissioners and the architect is to the effect that it is the intent of both parties to comply with the requirements of the law with respect to the architect's fees, which have not been paid to date. The taxpayers introduced evidence of previous architectural services to establish that it has been the practice of the commissioners to pay architects as much as ten per cent of the cost of the project. The architect engaged in this case testified that he intended to charge the commissioners five per cent for preparation of the plans, specifications and details and that if the commissioners wished to engage him to supervise and inspect the work there would be an additional charge of one per cent of the cost of the building. In construing Section 11–11–32, N.D.C.C., quoted above, we are of the opinion that it restricts and limits only the amount that may be paid by the commissioners to an architect to five per cent for the preparation of plans, specifications and details. The intent of the statute to limit the payment in this manner is clarified by the application of the relevant sections contained in Chapter 48–02, N.D. C.C.

■ Chapter 11–11, N.D.C.C., provides for the general powers and duties of the board of county commissioners, whereas

Chapter 48–02, N.D.C.C., is a special chapter governing the altering, repairing, or constructing of any building belonging or appertaining to any of the public institutions of the state, or to any county, city, park district, school district, or other political subdivision of the state where the estimated cost amounts to more than $25,000. Chapter 11–11, N.D.C.C., was enacted under Chapter 21 of the Session Laws of 1877; Chapter 48–02, N.D.C.C., was enacted under Chapter 235 of the Session Laws of 1911. Section 1–02–07, N.D.C.C., provides as follows:

"Whenever a general provision in a statute shall be in conflict with a special provision in the same or in another statute, the two shall be construed, if possible, so that effect may be given to both provisions, but if the conflict between the two provisions is irreconcilable the special provision shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest legislative intent that such general provision shall prevail."

To the extent that the provisions of Chapter 48–02, N.D.C.C., conflict with those of Chapter 11–11, N.D.C.C., the former must prevail and we so hold.

"Where an enactment treats of a phase of a prior and more general law with which it conflicts the subsequent law governs and the former general law is repealed to the extent of the conflict." State ex rel. Public Service Comm. v. Montana-Dakota Utilities Co., 89 N.W.2d 94 (N.D.1958).

The pertinent provisions of the relevant statutes with regard to the architect's fees contained in this chapter are as follows:

" * * * In all cases where the estimated cost of such work exceeds twenty-five thousand dollars, such plans, drawings, and specifications shall be procured from a licensed architect * * *" Section 48–02–02, N.D.C.C.

"At least once in each calendar month during the continuance of work upon any public building or erection begun and carried on under the provisions of this chapter, the governing board, or a committee thereof duly authorized by the board for that purpose, shall meet and receive and consider estimates furnished by the supervising architect or the superintendent of construction of such building or erection * * * If no supervising architect and no superintendent of construction is employed upon such contract, the contractor, at the end of each calendar month during the continuance of work under any such contract, may furnish to such board or public body in charge of such work like estimates which shall be allowed in like manner. * *" Section 48–02–07, N.D.C.C.

"The governing board shall employ the architect furnishing the plans as provided in this chapter, or some other suitable person, who shall be a practical mechanic and builder with four years experience, as superintendent of construction of the work for which the plans and specifications are prepared, as provided by section 48–02–02. He shall have personal charge and supervision of the contractor on the work under the direction of the architect and the governing board employing him. He shall see that such contractor performs his work in compliance with the plans and specifications adopted by such board. The architect or any other person, acting as such superintendent, shall receive a reasonable compensation to be fixed by such board. * * *" Section 48–02–13, N.D.C.C.

There is no provision in Chapter 48–02, N.D.C.C., which sets the amount the architect may receive for preparing plans, drawings, and specifications. Therefore there is no conflict with Section 11–11–32, N.D.C.C., in that regard. The five per cent limitation of Section 11–11–32, N.D.C.C., also applies to the compensation which the architect may receive for work done under Section 48–02–02, N.D.C.C. However there is a conflict between this five per cent limitation and the provisions of Sections 48–

02–07 and 48–02–13, N.D.C.C. These sections provide that the architect employed under Section 48–02–02, N.D.C.C., may also be employed to perform additional duties, and Section 48–02–13, N.D.C.C., specifically states that he "shall receive a reasonable compensation" for his work. Therefore the five per cent limitation which is contained in Section 11–11–32, N.D.C.C., pertains to Section 48–02–02, N.D.C.C., but does not apply to Sections 48–02–07 and 48–02–13, N.D.C.C., and, therefore, the architect may receive additional compensation for supervising the work.

Both parties testified that they intended to comply with the law with respect to the compensation to be paid and, therefore, we find that an illegal act has not occurred here.

■ The record made in this trial does not disclose the recording of any resolution or minutes relative to the engaging of an architect and it appears that Section 11–11–35, N.D.C.C., quoted above, was violated; however, it does appear from the record that the architect prepared plans, specifications and details and furnished them to the commissioners, who accepted and approved them. An excerpt from the proceedings of the commissioners of a meeting held October 19, 1971, admitted in evidence at the trial, reads as follows:

"On motion by Mr. Kinney, seconded by Mr. Cummings, the Auditor was instructed to advertise for bids for the construction of a County Shop Building as per plans and specifications prepared by Grosz and Anderson Architects, Grand Forks, North Dakota, bids to be opened at 11:00 o'clock A.M., C.S.T., November 16, 1971."

The architectural firm referred to in these minutes is the same as that referred to in the taxpayers' claim that the architect was illegally engaged. It is clear from the excerpt of the minutes referred to and the evidence adduced at the trial that the architect did prepare plans, specifications and details which were furnished to and accepted by the commissioners. Additional evidence establishes that a call for bids was advertised, bids were received and, pursuant to excerpts from the minutes of the commissioners of November 16, 1971, bids for the construction of the county shop building were accepted.

■ It also appears that no written contract was entered into between the architect and the commissioners and that there was no line item appropriation for architect's fees. A public corporation, however, may not escape liability for the reasonable value of the plans and specifications obtained and retained by it through transactions coming within the general powers of the commissioners even though the proceedings of the commissioners were defective. Thus the County will be required to pay the reasonable value of the plans and specifications received when equity and good conscience require payment.

In Backhaus v. Lee, 49 N.D. 821, 194 N. W. 887 (1923), it was held that an injunction will not lie at the suit of taxpayers to enjoin the county commissioners from paying for culverts and bridges purchased through procedurally defective transactions which include the failure to advertise for bids for the length of time required by statute. The court points out that the material was furnished in good faith, that it was necessary, and that the county received full value. It then reached the conclusion that the equitable powers of the court could not be invoked to aid the accomplishment of a purpose manifestly inequitable, and denied the injunction. *Backhaus* governs in this case. It has been cited with approval in subsequent cases. Merchants Nat. Bank & Trust Co. v. City of Grand Forks, 130 N.W.2d 212 (N.D.1964); Northwestern Sheet & Iron Works v. Sioux County, 76 N.D. 451, 36 N.W.2d 605 (1949); Stark County v. Dickinson, 56 N.D. 371, 217 N. W. 525 (1928).

For these reasons we find that the trial court did not err in failing to grant the injunction on this ground.

■ The next illegal act complained of pertains to the publication of the notice for bids. The taxpayers claim that the notice for bids did not comply with the statutes inasmuch as the notice provided for a 26-day period of time between the first publication of the advertisement for bids and the day set for the opening of bids, instead of a period of thirty days as required by Section 11–11–26, N.D.C.C.

The taxpayers cite in support of their contention Section 11–11–26, N.D.C.C., which was last amended by Chapter 109 of the Session Laws of 1957. It requires that when the amount to be paid by a county for the erection of county buildings, for the purchase of fuel, or for election ballots and supplies exceeds $1,000 the board of county commissioners shall cause an advertisement for bids to be published at least once each week for two successive weeks, and that the first publication shall be made at least thirty days prior to the day set for the opening of bids.

In support of their contention that they have complied with the law the commissioners cite Sections 48–02–02 and 48–02–03, N.D.C.C. These sections were last amended by Chapter 454 of the Session Laws of 1971. They provide that in all cases where the estimated cost of constructing a new building by a county exceeds $25,000, it shall advertise for bids for the doing of the work, which advertisement shall be published for three successive weeks, the first publication thereof to be at least twenty-one days prior to the date of the opening of bids. Thus there appears to be a conflict in the law with respect to the time to be allowed before the opening of bids for the construction of a building by a county, costing in excess of $25,000. As discussed previously, the provisions of Chapter 48–02, N.D.C.C., must prevail.

Inasmuch as at least twenty-one days passed after the first publication of the no-tice for bids we hold that there is no error here.

Next the taxpayers specify as further illegal acts: (1) that the commissioners did did not adopt a resolution authorizing entry into a written contract with a successful bidder as is mandatory under Section 11–11–29, N.D.C.C.; (2) that no contract for the construction has been executed by the commissioners; (3) that the written contract submitted by the successful bidder, Eickhof Construction, Inc., is illegal inasmuch as it does not specifically provide that not more than seventy per cent of the contract price shall be paid until the contract is executed and completed to the satisfaction and acceptance of the Board, which is in violation of Section 11–11–29, N.D.C.C.; and (4) that in the event this court should determine that Chapter 48–01, N.D.C.C., is applicable the commissioners have not certified, as required by Section 48–01–02, N.D.C.C., to the contractor's surety company "that the contract to be awarded has been developed, advertised, and bid in accordance with all the provisions of chapter 48–02 relative to such construction."

The record reflects that on November 16, 1971, the commissioners accepted bids. An excerpt of the minutes reads as follows:

"On motion by Mr. Kinney, seconded by Mr. Cheatham, the Board accepted the base bid of Eickhof Construction Company for the Grand Forks County Shop Building of $155,300 for the General Construction of Schedule A; the base bid of Air Control Heating, Inc. of $37,357. for the plumbing and heating of Schedule A; and the base bid of G–M Electric Company of $19,272.00 for electrical work of schedule A, all members voting Aye."

Subsequently Eickhof Construction Company prepared and executed a proposed form of contract which was submitted to the commissioners, but before any action was taken by them this suit was instituted. A temporary restraining order was served upon the commissioners on November 24,

1971, thus preventing them from taking any further action. The matter has been in a state of limbo since then except for a short period of time when the restraining order was dissolved by the trial court and, upon application of the taxpayers, was reinstated at the direction of this court in order to maintain the status quo pending appeal. According to the brief of the commissioners on this appeal, during the period when the temporary restraining order was not in effect, the contract was modified to comply with the statutes cited by the taxpayers and was executed and completed by the commissioners. However, this incident, if it be a fact, is not a part of the record before us for review.

■ We see no merit in the arguments of the taxpayers inasmuch as the illegal acts complained of had not been committed, and we cannot speculate that they would have been committed had not the taxpayers commenced this action and obtained a temporary restraining order.

Finally, the taxpayers complain that the commissioners could not pay for the county shop building out of the revenues of the County for the current year as required by statute and, therefore, proceeded illegally inasmuch as they did not submit such extraordinary outlay of money to a vote of the electors. They rely on the following statutes, which provide:

"The board of county commissioners may provide for the purchase, erection, repair, and maintenance of the courthouse, hospitals, jails, and other necessary buildings within and for the county. It may purchase the sites for such county buildings if necessary and may make contracts on behalf of the county for the building, repairing, and maintaining thereof *if the expenditures therefor are not greater than can be paid out of the revenue of the county for the current year.* The board shall have the entire supervision of the construction of such buildings." Section 11–11–16, N.D.C.C. [Emphasis added.]

*"The board of county commissioners shall submit to the electors of the county at any regular or special election any proposal for an extraordinary outlay of money by the county when the proposed expenditure is greater in amount than can be provided for by the annual tax levies.* If the board considers the courthouse, jail, or other public buildings of the county inadequate for the needs of the county or deems it necessary to build a county hospital, and if it is thought that it is not for the best interests of the county to issue bonds to aid in the construction of such buildings or that the construction of such buildings by any other procedure is not for the best interests of the county, *it shall submit to the electors of the county,* at any regular or special election, *the proposal for the construction of a* courthouse, jail, or other *public building by establishing a building fund* to aid in the construction thereof." Section 11–11–18, N.D.C.C. [Emphasis added.]

The commissioners contend that the expenditure of $211,929, being the total of the bids for the construction of the county shop building, plus the architect's fee, does not involve an expenditure of an amount greater than could be paid out of the revenue of the county for the year 1971. The evidence establishes that the commissioners appropriated $120,000 for the construction of a county shop building in their 1971 budget. This item was set forth in the budget, which was proposed, advertised and adopted under the heading of "ROAD AND BRIDGE" as a special line item entitled "New County Equipment Shop Building $120,000." As credits to the budget estimate are two items, which testimony reveals were moneys received from sources other than taxes, that were earmarked to defray the cost of a new county shop building. They are set forth in the following manner: "Pillsbury for purchase of County Addition $81,500.00" and "Urban Renewal for purchase of County Shop $28,500.00." These items of credit were explained as follows: The "Pillsbury for purchase of

County Addition" consists of money received from the sale of other land owned by the County which had originally been acquired for county shop purposes, and "Urban Renewal for purchase of County Shop" was money anticipated to be received from the Urban Renewal Agency for the old county shop building. These two credits total $110,000. There was an appropriation of $120,000. Therefore it appears that there was to be a $10,000 tax levy for the construction of a county shop building.

It developed, however, that the estimated appropriation of $120,000 was not sufficient to cover the cost of the new county shop building which, according to the bids received, totals $211,929, plus architect's fees.

When the commissioners finally settled with the Urban Renewal Agency, which acquired the old county shop building, the County received a sum less than was estimated in the budget. The sum actually received was $25,850. Thus the money actually available in the Road Fund which was earmarked for the construction of a county shop building was $107,350 rather than the estimated appropriation of $120,000. If we add six per cent for architect's fees to the actual construction cost of $211,929, the total cost of the project will be $224,645. This leaves an unappropriated balance of $117,295.

It is the contention of the commissioners that this balance may be paid out of revenues of the County for the current year without relying on an additional tax levy. The commissioners point to certain funds which contain surpluses from which transfers may be made to pay this additional amount. The commissioners contend that there is an unencumbered balance of $21,000 in the Capital Improvement Fund; an unencumbered balance of $32,231 in the Federal Disaster Fund; and a commitment from the Water Management Board for the payment of $8,000, $4,000 of which would be paid in 1971, for office space in the new county shop building. These transfers, if made, will total $57,231, leaving an unappropriated balance of $60,064. They then point out that the Emergency Fund, as of the day of the letting of bids, to wit, November 16, 1971, contained $100,749.72, which may be utilized to pay the balance.

The taxpayers challenge the availability of all the above amounts. The $4,000 payment from the Water Management Board will not be considered here; the amount involved is insignificant in relation to the other funds and whether or not it is available would not affect the question of the sufficiency of funds to pay the balance of the cost of the county shop building.

■ According to the evidence the Capital Improvement Fund contains $21,000 which is the unexpended balance of a special fund set up for the purpose of courthouse improvement and repair. All claims against this fund have been paid, the purpose for which it was created has been completed, and there remains no further use for the balance for the purpose for which the fund was created. Section 11–11–33, N. D.C.C., provides:

"Whenever there remains in the treasury of a county an unexpended balance of a special fund and all claims against the fund have been paid, and the purpose for which it was created has been subserved fully, and there remains no further use for the balance for the purpose for which the fund was created, the board of county commissioners may transfer the balance to any other fund of the county or to the subdivision to which the balance belongs."

Therefore the balance in this fund can be made available for the purpose of paying a portion of the construction cost of the new county shop building.

It appears that the fund termed "Federal Disaster Fund" has not been received by the County. The decision for its potential use by the commissioners is based on a letter from the Natural Disaster Representative of the North Dakota Civil Defense,

dated October 18, 1971, addressed to the County Engineer of Grand Forks County, stating that this sum had been approved by the regional director for payment to the County. It is explained that its purpose is to reimburse the County for work done by the County in the repair of flood damage to roads in the spring of 1971. The evidence is unsatisfactory as to this item and, on the basis of the record, we cannot judge whether these moneys, when and if received, can be made available to defray the construction cost of the new county shop building. Therefore, under the circumstances, we cannot pass on this question. However, if the federal disaster moneys are not available there are moneys available in the Emergency Fund, the balance of which is not disputed. There are also other funds which the commissioners have stated they intend to use, which are being challenged. We will first consider these challenges and then make a determination as to the availability of the Emergency Fund to defray the balance.

The taxpayers insist that the Pillsbury Fund in the amount of $81,500 and the Urban Renewal Fund in the amount of $25,-850 are not available for the purpose of constructing a new county shop building because these funds were covered into the Road Fund by the commissioners and, therefore, can be expended only for road machinery and for grading, ditching and surfacing of roads and highways. They refer us to Sections 24–05–01 and 24–05–02, N.D.C.C. These sections read as follows:

"In each county of this state having a population of two thousand or more according to the latest United States or state census, there shall be levied and collected a property tax of not less than one-fourth of one mill, nor more than the maximum rate permitted by law, on each dollar of the assessed valuation of all taxable property in the county for the improvement of highways. Of the proceeds of such tax collected on account of real or personal property situated within any city, by the county treasurer

of the county in which such city is located, twenty percent shall be turned over by such treasurer to the treasurer of such city, in the manner provided in section 11–13–06 to be expended under the direction of the governing body of such subdivision in the improvement of the streets and highways thereof. All other proceeds of such tax shall be kept in a distinct fund to be known as the 'county road fund' and shall be expended in the improvement of highways as provided in this chapter under the direction of the board of county commissioners. Such taxes shall be in addition to all other taxes for highway purposes otherwise provided by law. The provisions of this section in regard to allocation shall apply to the proceeds of any tax originally levied for other purposes if appropriated or transferred to the county road fund or for expenditure for road and bridge purposes." Section 24–05–01, N.D.C.C.

"The county road fund created by section 24–05–01 shall be expended only for road machinery and for grading, ditching, and surfacing, in proper form and condition for public travel, such highways or parts of highways, howsoever established, as constitute the principal thoroughfares of the county, communicating with shipping points and market places resorted to by inhabitants of the county, for which the means otherwise provided, in the opinion of the board of county commissioners, are not sufficient." Section 24–05–02, N.D.C.C.

The evidence submitted by the commissioners establishes that the Pillsbury and Urban Renewal Funds were set up as a special fund within the Road and Bridge Fund for a "new county equipment shop building." Thus the commissioners argue that no road taxes were levied for the new county shop building and that the transfer of the money into the special fund earmarked these receipts for the new county shop building and not "for expenditure for road and bridge purposes" as provided in

Section 24–05–01, N.D.C.C. Therefore they are not bound by the restriction as provided by Section 24–05–02, N.D.C.C. In other words, the commissioners insist that there was no appropriation of $120,000 for road and bridge purposes but that this sum was specifically appropriated in the budget for the construction of a new county shop building. Although we think that it would have been a better procedure to have covered the Pillsbury Fund and the Urban Renewal Fund into a special building fund within the General Fund, the procedure followed by the County is not so violative of the statutes as to restrict these funds to be expended only for road machinery and for grading, ditching and surfacing highways or parts of highways, as provided by Section 24–05–02, N.D.C.C.

■ The taxpayers also argue that because no resolution has been adopted by the commissioners declaring an emergency and directing the payment of funds from the Emergency Fund, these funds are not available for the purpose of constructing the new county shop building. It is the contention of the commissioners that the proper resolution will be adopted and placed upon the minutes when it becomes necessary to utilize the Emergency Fund. They argue that this is the practice which has been followed in the past and evidence was introduced in support of this contention. We agree that the resolution need not be adopted until that time.

Section 57–15–28, N.D.C.C., provides that the County may levy a tax for emergency purposes and create an Emergency Fund. Such taxes when collected shall be covered into such Emergency Fund,

"and shall be used only for emergency purposes caused by the destruction or impairment of any county property necessary for the conduct of the affairs of the county, emergencies caused by nature or by the entry by a court of competent jurisdiction of a judgment for damages against the county. The emergency fund shall not be used for any road construc-

tion or maintenance, except for repair of roads damaged by nature within sixty days preceding such determination to expend emergency funds, or for the purchase of road equipment."

The record establishes the necessity for having a county shop building for the repair, maintenance and storage of county road equipment. The County was required to vacate the old county shop building when it was acquired by the Urban Renewal Agency. A temporary shop building was arranged for on a rental basis but it appears that these quarters are inadequate and dangerous. We believe that there was an impairment of county property and that an emergency exists which necessitates the use of the Emergency Fund to pay the unappropriated balance after other available funds have been exhausted.

■ The taxpayers also argue that further evidence that the proposed county shop expenditure is greater in amount than can be paid from current funds or by the annual tax levy is indicated by reason that the County has borrowed, by certificates of indebtedness, $150,000 for the Road and Bridge Fund on September 7, 1971, and $100,000 for the General Fund on December 30, 1971; that this pattern of borrowing has been followed by the County since 1968. The taxpayers argue that this shows deficit financing rather than financing from current revenues. The commissioners, in response to this argument, show that these borrowings are made for interim purposes as authorized by Chapter 21–02, N.D.C.C. The county fiscal year begins on July 1 and ends on June 30 of the following year. Taxes do not become due and payable until January 1 of the year following the beginning of the fiscal year. The County borrowed moneys upon which to operate the County for six months before taxes were payable by use of the certificates of indebtedness. We do not think that this system of operation constitutes deficit spending in the sense that it would activate the restrictive language of Section

11–11–16, N.D.C.C. This section provides that the board of county commissioners may contract for the erection of a building if the expenditures therefor are not greater than can be paid out of the revenue of the County for the current year (the current year having reference to the fiscal year). This practice also does not activate the provisions of Section 11–11–18, N.D.C.C., which requires an election when a proposed expenditure is greater than can be provided for "by the annual tax levies."

█ It thus appears that the proposed expenditure for the new county shop building is not in excess of county revenues for the year 1971 and we so hold.

Current Available Funds

| | | |
|---|---|---|
| Pillsbury Fund | $ 81,500.00 | |
| Urban Renewal Fund | 25,850.00 | |
| Capital Improvement Fund | 21,000.00 | |
| Emergency Fund | 100,949.72 | |
| Total | | $229,299.72 |
| Projected Cost of Construction of New County Shop Building, including Architect's Fees | | 224,645.00 |
| Excess Available Funds | | $ 4,654.72 |

## TITLE AND RESTRICTIVE COVENANTS

The taxpayers have specified that the court erred in finding that the title of Grand Forks County to the property upon which it is intended to locate the new county shop building cannot be challenged by the taxpayers through this injunctive action for the purpose of showing abuse of discretion; that the trial court erred in finding that restrictive covenants contained in the documents relating to the property prior to the year 1932 were terminated; and that the trial court erred in finding that the use of the property, or a portion thereof, for a county shop building is for a "community purpose" and is not violative of a restrictive covenant.

The commissioners have selected a site for the new county shop building upon a portion of the land which is commonly referred to as the "fairground property". Pursuant to entries contained in the abstract of title in evidence it appears that this land was acquired by the Grand Forks Agricultural Society of Grand Forks, North Dakota, through various conveyances from 1903 to 1905. On June 16, 1905, the Grand Forks County Agricultural Society conveyed the land to the North Dakota State Fair Association for Grand Forks. This conveyance was in harmony with a 1905 legislative Act (Ch. 46, S.L.1905) establishing state fairs and locating them at Grand Forks and Fargo, North Dakota. This Act provided that if an organization designated as the "North Dakota State Fair Association for Grand Forks" shall be organized as a corporation, with paid up capital stock of not less than $20,000, such association shall become entitled to receive certain state appropriations upon conditions set forth in the Act. The Act authorized the North Dakota State Fair Association for Grand Forks to convey title to the land which it might acquire unto the state of North Dakota for the purpose of holding a fair or exhibition, as described therein, biennially during each odd-numbered year. The North Dakota State Fair Association for Grand Forks was formed and obtained title to the land in question and conveyed it to the state of North Dakota on June 16, 1905. The habendum clause of the deed contains a reverter authorized by the Act, which states:

"Provided however, that should the State of North Dakota cease to appropriate the sum of at least $5,000 in each odd numbered year to be awarded as premiums in consideration of said fairs to be held by the said North Dakota Fair Association for Grand Forks, then the title of said premises shall revert to the North Dakota State Fair Association for Grand Forks."

The abstract also indicates that in 1936 the North Dakota State Fair Association for Grand Forks, by a resolution adopted

by the stockholders, changed the clause of reversion to provide as follows:

"Provided however that should the State of North Dakota cease to appropriate the sum of at least $5,000.00 in each odd numbered year to be awarded as premiums in connection with said Fairs to be held by said North Dakota State Fair Association for Grand Forks, then the title of said premises shall revert to and become the property of County of Grand Forks, North Dakota to be used forever for the purpose of holding Fairs and Exhibitions under the management of the Grand Forks Fair Association and for no other purpose."

According to a certificate in evidence from the secretary of state, the state legislature made its last appropriation for the purposes described above in 1931 for use in the years 1931 and 1932. In 1967, by Chapter 401, the state legislature directed the transfer of the land to the county of Grand Forks. Pursuant to this Act, on October 31, 1967, the governor and the secretary of state executed and delivered a quitclaim deed to the property to the county of Grand Forks.

On December 3, 1968, an agreement in writing was entered into between the Grand Forks State and County Fair Association (a new, nonprofit fair corporation) and the county of Grand Forks. According to this agreement a large amount of real estate taxes and special assessments had accrued against the fairground property and "the parties desire to re-establish the ownership, and management and control of such real property in order to assure the continuation of local fairs and also to provide facilities for sports, musical and other community activities and also to dispose of a part of such property for business use and thus obtain proper tax revenues therefrom * * *". The agreement further provides that the Grand Forks State and County Fair Association will obtain a deed to a portion of the property and that the county of Grand Forks will obtain a deed to an-

other portion of the property; that Grand Forks State and County Fair Association will sell the property to which it obtained the deed and the net proceeds after the payment of all expenses, taxes, costs of platting and perfection of title will be deposited and used for fair purposes under the joint supervision and direction of both parties to the agreement; that the property obtained by the county of Grand Forks is "to be held in trust for the benefit of the first party [Grand Forks State and County Fair Association] and to be used for fair purposes, community activities and other uses which would be in the public's interest, education, recreation and welfare * * *". The County also agreed to bring an action to quiet the title to this property.

Subsequently each of the parties obtained a deed from the North Dakota State Fair Association for Grand Forks (the old corporation), which deeds recite that they were signed by the surviving directors and trustees of the corporation. The deed to Grand Forks County contains a limitation or restriction that the property is conveyed "for the use and benefit of the public for fair and community purposes."

Thus the county of Grand Forks obtained a quitclaim deed from the state of North Dakota for all of the fairground property and a quitclaim deed from the old fair corporation for that portion it was to receive under the agreement entered into with the Grand Forks State and County Fair Association (the new corporation). It appears that subsequently the Grand Forks State and County Fair Association quieted title to that portion of the property it was to receive under the agreement, sold various parcels thereof, and paid the taxes and special assessments upon all of the property.

The fairground property was platted in 1969 as Fairgrounds Subdivision at Grand Forks. In this platting it was divided into five blocks. The property claimed by Grand Forks County consists of 60.25 acres, more or less, and is designated as Block

4. The remaining property, claimed by the Grand Forks State and County Fair Association, consists of Blocks 1, 2 and 3, which contain 6.92 acres, more or less, and Block 5 which contains 0.61 acres, more or less. The platting was authorized by Grand Forks State and County Fair Association and although it was not joined in by the county of Grand Forks the record does not disclose any objection to the platting. Although the record is not entirely clear it appears that that portion of Block 4 intended for use by the County for county highway shop purposes, including the yard area, consists of about twenty per cent of Block 4 and is located in the northwest corner. The record does not show whether a fair has been held on this property in recent years. According to the agreement entered into on December 3, 1968, between Grand Forks State and County Fair Association and the county of Grand Forks, a fair was not conducted upon the land in the years 1966, 1967 and 1968. Whether a fair has been conducted or operated upon this land since then we do not know. The agreement provides, in part:

"* * * should such property cease to be used for fair purposes, or for education, recreation and welfare of the public then the title shall escheat or revert and become the absolute property of the second party [Grand Forks County] and treated and considered as property of the taxpayers of the County of Grand Forks."

It is clear from the record that the original fair corporation (the North Dakota State Fair Association for Grand Forks) is defunct, having ceased to exist in the year 1945.

In view of these facts it appears probable that the restrictive covenants have terminated.

"While there is some authority that where the duration of a restrictive covenant is not specified, the restrictions are presumed to continue for the whole duration of the estate created, the rule followed generally is that the restrictive covenant will be limited to such time as seems reasonable from the nature of the case. Accordingly, the restrictions will not be construed as extending for a longer period of time than the nature of the circumstances and the purpose of their imposition would indicate as reasonable for the duration of their enforcement without undue and inequitable prejudice to the property rights purchased and acquired by the original grantee and his successors in title, subject to the restrictive covenants. Consistent with the general principle of strict construction of restrictive covenants, where there is substantial and reasonable doubt whether the restriction is perpetual or is of limited duration, the doubt will be construed against the one claiming perpetual restriction." 20 Am.Jur.2d, Covenants, Conditions, Etc., Section 180.

It further appears from the record that the commissioners obtained an oral opinion from the state's attorney that the County had free and clear title to Block 4. The commissioners have also purchased title insurance for the property which is subject only to standard exceptions and the limitation and restriction cited above in the deed from the surviving directors of the old fair corporation to the County.

The taxpayers do not contend that this is an appropriate proceeding in which to determine or to clear title. Their contention is that the trial court erred in finding that the commissioners did not abuse their discretion in locating the new county shop building upon Block 4 of the fairground property in view of the confused status of the title to the property and the restrictive covenants. They argue that from the record it is abundantly clear that little or no consideration was given to the status of the title to the fairground site, which shows a lack of reasonable business judgment on the part of the commissioners and that this is particularly true in view of the letter from the taxpayers' attorney, dated September 15, 1971, in which he raises these ques-

tions of title. For these reasons they argue that the commissioners are guilty of a flagrant abuse of discretion in proposing to construct the new county shop building upon this land at a great cost to the taxpayers of Grand Forks County.

The trial court, after having reviewed the matter, stated that it was of the opinion that the position taken by the commissioners was correct in that the taxpayers in this injunctive proceeding were not in a position to challenge the title and that the commissioners have not abused their discretion by selecting the site upon Block 4 of Fairgrounds Subdivision for the construction of the new county shop building. We conclude that the commissioners have acted in good faith and that the taxpayers have not shown that the title to the land is deficient to the extent that the County will suffer a loss. It will, therefore, be presumed that the commissioners are in a position to clear the alleged clouds to the title in an appropriate quiet title action.

 Section 11–11–16, N.D.C.C., quoted earlier in this opinion, gives the commissioners the power to acquire sites for county buildings. As long as the commissioners exercise this discretion in good faith, the courts will not interfere. McCann v. Carlson, 26 N.D. 191, 144 N.W. 92 (1913).

## EXCESSIVE COST OF PROPOSED BUILDING

 The plaintiffs also contend that the cost of the proposed masonry building, when contrasted with the cost of a pre-engineered, prefabricated steel structure building, is so grossly excessive that it constitutes an abuse of discretion by the commissioners.

The cost of the proposed masonry building is $211,929. The cost of a pre-engineered, prefabricated steel building, as indicated by a preliminary estimate furnished by one Stanley Sand who sells and rents prefabricated steel buildings, amounts to $126,850. This is a difference in cost of $85,079. This estimate, however, was prepared prior to drawing up plans and specifications and may not accurately reflect the final cost figure for a steel building.

But even if the $126,850 figure is accepted as accurate the difference, taking into consideration the difference in quality of the two types of buildings, is not so grossly excessive as to constitute an abuse of discretion. Furthermore a steel building does not comply with the requirements of the fire zoning ordinance.

In Schatz v. City Council of City of New England, 61 N.W.2d 423 (N.D.1953), the court held that the sale of the city's electric utility for $105,000 and the extension of gas service to the city, when the plaintiffs claimed the value of the utility was $150,-000, was not so grossly inadequate as to indicate a want of reasonable judgment and discretion. In the present case we believe that the cost of the masonry building is not so grossly excessive when compared to the cost of a steel building that it constitutes an abuse of discretion.

In Gehrke v. Board of Commissioners, 58 N.D. 407, 226 N.W. 536 (1929), which was a suit by taxpayers to restrain the county commissioners from proceeding pursuant to a resolution passed by them providing that a war memorial should be constructed, and from expending any public funds for such construction, in upholding the actions of the county commissioners the court held as follows:

"The statute here involved reposes a very wide discretion in boards of county commissioners. The defendant commissioners acted under the power granted to them. They exercised their discretion. Even though their judgment may not have been sound, or their discretion wise, nevertheless that which they determined upon will not be disturbed in a court of equity, unless an abuse of discretion so great as to amount to fraud is established."

There has been no evidence of fraud in the case before us and therefore there is no abuse of discretion.

Plaintiffs' final contention is that written petitions have been presented to the commissioners expressing a preference for a central county location for the building. In *Gehrke* the court stated the following in answer to the contention that a majority of the citizens of the county were opposed to the proposed location of the war memorial:

"But the statute delegates the power to the board, without restriction, to determine both the questions of whether a memorial shall be erected and where it shall be erected. It does not contemplate that these questions are to be determined by popular vote, or by petition, or by remonstrance. The statute imposes upon the board itself the duty of passing upon these questions. It alone is made responsible. The board, of course, may consider petitions or remonstrances, if it sees fit to do so; but it is not bound thereby. The commissioners must exercise their discretion in the matter, and, having done so, the fact that their judgment is counter to that of a large number of the citizens of their county is not alone sufficient reason for interfering with their determination." Gehrke v. Board of Commissioners, 226 N.W. 536, 539.

For the reasons set forth herein we affirm the judgment of the district court.

Judgment affirmed.

STRUTZ, C. J., and KNUDSON, PAULSON and ERICKSTAD, JJ., concur.